A98A0501. WINGATE v. RIDGEVIEW INSTITUTE, INC.
(504 SE2d 714)

Judge Harold R. Banke.

Ridgeview Institute, Inc. ("Ridgeview") sued Dan B. Wingate for an unpaid account balance. Wingate counterclaimed for false imprisonment, negligence in Ridgeview's selection, training, and supervision of its staff, and violation of the Georgia Fair Business Practices Act ("FBPA"). Enumerating three errors, Wingate appeals the summary judgment awarded to Ridgeview.

The underlying case arose after Wingate voluntarily consented to undergo alcohol detoxification treatment at Ridgeview beginning on May 18. At the time of his admission, Wingate signed a document entitled "AGREEMENT AND CONDITIONS OF VOLUNTARY ADMISSION." On June 9, after several weeks of inpatient treatment, Wingate decided that he wanted to participate in an outpatient program and sought his release. According to Ridgeview's express discharge procedures contained in the Agreement and Conditions of Voluntary Admission document, upon Ridgeview's receipt of a proper written discharge request, "you will be discharged unless that physician determines, after consideration of the recommendations of the treatment team, that your discharge would be unsafe to you or to others."

After Wingate requested his discharge, his treating physician refused to consent and, utilizing DHR Form 2021, authorized Wingate's involuntary retention. In denying Wingate's request, Perry G. Seese, M.D., wrote, "[h]e is again determined to leave the hospital to

'find his own treatment program.' He is angry, depressed, and at a high risk of relapse." Several days later, on June 17, another physician concluded that an "outpatient in an evening program would suffice." Ridgeview then permitted Wingate's discharge.

Wingate claimed that Ridgeview failed to comply with OCGA § 37-7-22 because the DHR certificate failed to contain a finding that the "chief medical officer finds that the discharge would be unsafe for the patient or others." Wingate also alleged inter alia that Ridgeview misrepresented its services and failed to properly train its staff to implement procedures to ensure that persons would not be improperly detained. OCGA § 10-1-393 (b) (2), (7).

The trial court struck Wingate's amended counterclaim which sought to add counts for abusive process, fraud, and breach of contract. After finding that Ridgeview's involuntary retention of Wingate was not unlawful and that no claim for false imprisonment could lie, the court apparently reasoned Wingate's claim under the FBPA, being derivative, failed as a matter of law. *Held*:

1. The trial court did not abuse its discretion in striking Wingate's amended counterclaim. *Conerly v. First Nat. Bank &c.*, 209 Ga. App. 601, 604 (3) (434 SE2d 143) (1993). Without seeking leave of court, more than one year after filing his original counterclaim, Wingate filed an amended counterclaim raising additional issues. The court correctly determined that these new counterclaims were compulsory and improper under OCGA § 9-11-13 (f). *Cornelius v. Auto Analyst*, 222 Ga. App. 759, 762-763 (3) (476 SE2d 9) (1996).

2. Wingate contends that Ridgeview was not entitled to summary judgment on the issue of false imprisonment. We agree.

In enacting the statutory framework relating to the hospitalization of alcoholics, the General Assembly explicitly established that "[i]t [is] the policy of this state to recognize the personal physical integrity of all patients." OCGA § 37-7-163 (a). To effectuate this express policy, the legislature established procedural safeguards which require "rigid adherence" to ensure no unlawful deprivation of a patient's personal liberty. *Kendrick v. Metro. Psychiatric Center*, 158 Ga. App. 839, 842 (282 SE2d 361) (1981) (physical precedent only).

In the underlying case, although Ridgeview attempts to apply part of this law to Wingate, its justification for so doing is not clear. Without question, Wingate entered Ridgeview as a voluntary participant in a treatment program under the terms of a contractual agreement with Ridgeview. He was not taken into custody or involuntarily committed for treatment. Nor was he admitted to an "evaluating facility" for the purpose of "evaluation" or "observation" under the terms of OCGA § 37-7-20 (a).

For these reasons, Ridgeview's reliance on OCGA § 37-7-22 is ill-conceived. By its express terms, that statute applies to patients vol-

untarily admitted for observation and diagnosis to an evaluating facility, not to those voluntarily admitted upon application for treatment. OCGA § 37-7-20 (a). In fact, Form 2021 specifically states that it is a "Certificate Authorizing Retention in Evaluating Facility Pending Transfer to Treatment Facility." Ridgeview offered no explanation as to why it could employ this form when Wingate had not been admitted for evaluation.

Even assuming arguendo that this statute had been applicable to Wingate, the law mandates that after a voluntarily admitted patient seeks his release, he "*must be discharged* from the facility, *unless* the chief medical officer *finds* that the discharge *would be unsafe for the patient* or others." (Emphasis supplied.) OCGA § 37-7-22 (a). Here, the record unquestionably is devoid of the mandatory finding that Wingate's discharge would be unsafe for him or anyone else. Instead, as the physician noted on Wingate's discharge summary, "At that point, I felt he was a great risk for relapse and began involuntary proceedings." Implicitly recognizing the vital liberty interest at risk, the General Assembly narrowly tailored the exceptional circumstances which would authorize involuntary medical treatment of an alcoholic patient to: "[i]n cases of *grave emergency* where the medical staff of the facility in which an alcoholic . . . has been accepted for treatment determines that immediate . . . intervention is necessary to prevent *serious physical consequences* or *death and* where delay in obtaining consent would create a *grave danger* to the physical health of such person, as determined by at least two physicians. . . ." (Emphasis supplied.) OCGA § 37-7-163 (e).

Ridgeview offered no authority supporting its arbitrary substitution of "best interest of the patient" criteria for the statutorily mandated finding that the "discharge would be unsafe to the patient or others." OCGA § 37-7-22 (a). Compare *Etheridge v. Charter Peachford Hosp.*, 210 Ga. App. 482, 486 (7) (436 SE2d 669) (1993). Where, as here, a patient's detention is not evidenced by a showing of objective compliance with all applicable procedures, a claim for false imprisonment may lie. *Williams v. Smith*, 179 Ga. App. 712, 716 (2) (348 SE2d 50) (1986). In the absence of the requisite medical finding, we cannot say as a matter of law that Ridgeview demonstrated "rigid adherence" with the statutory procedural safeguards. *Kendrick*, 158 Ga. App. at 842. Compare *Hudgins v. Bawtinhimer*, 196 Ga. App. 386, 387 (2) (395 SE2d 909) (1990) (procedurally valid certificate by physician or valid court order precludes claim for false imprisonment).

Without offering any authority or precedent, the dissent rewrites the explicit language of "unsafe for the patient," under the guise of construing its meaning. Even if we apply the dissent's suggested criteria to Wingate, Ridgeview offered no evidence that Wingate exhib-

ited "life-threatening levels of intoxication, withdrawal, or imminent danger thereof [or was] under the influence of alcoholic beverages [or was] incapable of caring for himself or protecting himself."

Further, the dissent's statutory revision of the plain language of OCGA § 37-7-20 (a) is neither persuasive nor supportable. Although the dissent includes patients admitted for treatment under this section, the legislature did not choose to do so. By its express terms, this Code section pertains to "any patient . . . making application [for observation and diagnosis]" and makes no mention of patients in Wingate's situation who voluntarily seek treatment. OCGA § 37-7-20.

In light of the lack of evidence of Ridgeview's strict compliance with OCGA § 37-7-22, even assuming arguendo that this statute had any applicability to Wingate's situation, summary judgment on Wingate's false imprisonment claim must be reversed. *Heath v. Peachtree Parkwood Hosp.*, 200 Ga. App. 118, 119 (2) (407 SE2d 406) (1991). To hold otherwise would not only eviscerate the mandatory statutory criteria of OCGA §§ 37-7-22 (a) and 37-7-163, but it would also erode individual rights "in the name of medical expediency." *Kendrick*, 158 Ga. App. at 842.

3. Wingate contends that a jury must resolve whether Ridgeview violated the FBPA (OCGA § 10-1-390 et seq.) by engaging in false and deceptive practices. We agree. In light of the evidence that Ridgeview failed to comply with OCGA § 37-7-22 and with its own written internal discharge procedures, summary judgment on Wingate's claim under the FBPA must be reversed.

*Judgment affirmed in part and reversed in part. McMurray, P. J., Blackburn and Eldridge, JJ., concur. Andrews, C. J., Pope, P. J., and Beasley, J., concur in part and dissent in part.*

BEASLEY, Judge, concurring in part and dissenting in part.

I concur fully in Division 1 but respectfully dissent as to Divisions 2 and 3.

1. Wingate voluntarily admitted himself to the facility pursuant to OCGA § 37-7-20. The majority's conclusion that OCGA § 37-7-20 does not apply to Wingate's admission is based (i) on its legal analysis that the statute applies only to patients received for observation and diagnosis, not for treatment, and (ii) on its factual analysis that Wingate requested only the latter. Neither of these is correct.

First, it is true that OCGA § 37-7-20 (a) refers to patients voluntarily applying for "observation and diagnosis." But the statute is purposely broad and includes such as parts of the definition of treatment. " 'Treatment' means the broad range of emergency, outpatient, intermediate, and inpatient services and care, including diagnostic evaluation. . . ." OCGA § 37-7-1 (20). Thus, a request for treatment

would include a request for observation and diagnosis, although the converse is not necessarily true. One may be diagnosed and observed without being treated, but one may hardly be effectively treated without ongoing observations and diagnoses as part of the treatment itself. Wingate's request for treatment fell under the statute. OCGA § 37-7-20 (a) states that once a person is found to be suitable for treatment for alcoholism, "such person may be given care and treatment at such facility; and such person may be detained by such facility until discharged pursuant to Code Section 37-7-21 or 37-7-22."

Second, in his admission form Wingate requested not only standard treatments but also "routine diagnostic procedures." During his stay the records reflected he was extensively observed and evaluated for diagnostic purposes. Certainly Wingate did not want treatment without being observed and diagnosed as part of that treatment.

2. Wingate requested discharge in writing on June 9, 1993. OCGA § 37-7-22 (a) provides that the patient must be discharged within 72 hours after the chief medical officer receives the discharge request "unless the chief medical officer finds that the discharge would be unsafe for the patient or others, in which case proceedings for involuntary treatment must be initiated. . . ."

The definitions section of the statute elucidates how a physician finds a discharge unsafe for the patient or others. OCGA § 37-7-1 (3) defines an " '[a]lcoholic, drug dependent individual, or drug abuser requiring involuntary treatment' [as] a person who is an inpatient. . . ." " 'Inpatient' means a person who is an alcoholic, a drug dependent individual, or a drug abuser and: (A) (i) Who presents a substantial risk of imminent harm to that person or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to that person or other persons; or (ii) Who is incapacitated by alcoholic beverages, drugs, or any other substances . . . on a recurring basis; and (B) Who is in need of involuntary inpatient treatment." OCGA § 37-7-1 (14.1).

The statute further defines "incapacitated by alcohol or drugs" to mean that "a person, as a result of the use of alcoholic beverages, any drug, or any other substances . . ., exhibits life-threatening levels of intoxication, withdrawal, or imminent danger thereof, or acute medical problems; or is under the influence of alcoholic beverages or drugs or any other substances . . . to the extent that the person is incapable of caring for himself or protecting himself due to the continued consumption or use thereof." OCGA § 37-7-1 (13).

Thus, there are two ways a chief medical officer can determine a discharge would be unsafe for the patient or others. Either (a) the patient's overt acts or threats mean that he likely will physically harm himself or others, or (b) the patient is incapacitated by the substance abuse, i.e., he cannot take care of himself or life-threatening

levels of intoxication or withdrawal are present or imminent.

OCGA § 37-7-163 (e) refers to the presence of grave emergencies or dangers and to serious physical consequences or death. It does not apply to the retention of patients needing treatment for alcoholism. By its express terms it applies only to "immediate surgical or other intervention," not to retention. Understandably, the General Assembly imposed a higher standard of findings before involuntary surgical procedures could invade a patient's body.

The doctors here concluded that Wingate was incapacitated by his alcoholism, particularly considering his history and attitude. On the day after Wingate's discharge request, Dr. Seese, Dr. Bowling and the chief medical officer signed a Georgia Department of Human Resources form entitled "Certificate Authorizing Retention In Evaluating Facility Pending Transfer To Treatment Facility," which tracked the statutory language. It stated that Drs. Seese and Bowling had examined Wingate that very day and that Wingate was "an alcoholic, drug dependent individual, or drug abuser requiring involuntary treatment in that he is an alcoholic, a drug dependent individual, or a drug abuser *(circle applicable term) AND* (a) presents a substantial risk of imminent harm to himself or others as manifested by either recent overt acts or recently expressed threats of violence which present a probability of physical injury to himself or to other persons, or (b) is incapacitated by alcohol or drugs *(circle applicable term)* on a recurring basis; *(underline criteria used)*." Because section "b" of the sentence was underlined and the word "alcohol" circled, the requisite finding that discharge would have been unsafe to Wingate or others was present.

The certificate and other required notices were filed with the superior court that same day. Ridgeview thereby promptly commenced judicial proceedings so as to protect Wingate's rights regarding involuntary treatment, as the law required. See OCGA § 37-7-81. "Such filing shall authorize the detention of the patient by the facility pending completion of a full and fair hearing. . . ." OCGA § 37-8-81 (a). Wingate was discharged prior to the hearing date.

The language of the certificate and the filings rigidly followed the procedural safeguards of the statute. *Williams v. Smith*, 179 Ga. App. 712, 714 (2) (348 SE2d 50) (1986), held that "[w]hen the detention is predicated upon procedurally valid process, false imprisonment is not an available remedy, regardless of the motives upon which the process was secured, because detention effectuated pursuant to procedurally valid process . . . is not 'unlawful,' " an essential element of a false imprisonment claim. (Emphasis omitted.) See *Ridgeview Institute v. Handley*, 224 Ga. App. 533, 534-535 (1) (481 SE2d 531) (1997); see also *Scott Housing Systems v. Hickox*, 174 Ga. App. 23, 24 (1) (329 SE2d 154) (1985) (essential element of false

imprisonment is unlawfulness of detention).

The court did not err in entering summary judgment on the false imprisonment claim. Because Wingate argues false imprisonment as the only basis for his FBPA claim, we should affirm summary judgment on this claim also.

The trial court's decision was correct in its entirety.

I am authorized to state that Chief Judge Andrews and Presiding Judge Pope join in this opinion.

DECIDED JULY 14, 1998 —
RECONSIDERATION DENIED JULY 30, 1998 — 

*Chamberlain, Hrdlicka, White & Williams, Richard N. Hubert*, for appellant.

*Troutman Sanders, Daniel S. Reinhardt, Jennifer K. Campbell*, for appellee.